NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0823n.06
Filed: November 8, 2006

No. 05-1687

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Arben Cela, | ) | ON PETITION FOR REVIEW |
| | ) | FROM A FINAL ORDER OF THE |
| Petitioner, | ) | BOARD OF IMMIGRATION APPEALS |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| Alberto R. Gonzales, Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

**BEFORE:     GIBBONS, McKEAGUE, Circuit Judges; and FORESTER, District Judge***

**Forester, District Judge.**   Petitioner Arben Cela seeks relief from his removal decision by an Immigration Judge (IJ) and the final order summarily dismissing his appeal by the Board of Immigration Appeals (BIA). Cela's counsel failed to notify him that his appeal had been denied; thus, he did not seek further relief or exercise his right to voluntarily depart. Subsequently, Cela filed a habeas corpus petition alleging ineffective assistance of counsel and other due process violations regarding his removal hearing. The habeas petition was transferred to this Court pursuant to the REAL ID Act of 2005. For the reasons stated below, we affirm the decision of the BIA on the merits.

**FACTUAL AND PROCEDURAL BACKGROUND**

Cela is a citizen of Albania who entered the United States on a fraudulent Italian passport October 13, 1998 and sought administrative asylum in September 1999. The Immigration and Naturalization Service (INS) denied his administrative request for asylum,

---

* The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

charged him with being removable, and referred the asylum application to an IJ. On February 14, 2000, Cela married an Albanian citizen who had been granted asylum. On February 17, 2000, Cela, assisted by counsel, submitted a supplemental written application for asylum to the IJ and included a three-page, single-spaced addendum in support. An additional supplemental application was filed April 24, 2000. At a preliminary hearing on May 2, 2000, Cela conceded removability.

At his February 16, 2001, removal hearing, Cela testified as follows. While a student in Tirane, he participated in a student movement in 1990 for the Democratic Party and in a February 1991 hunger strike to remove Marxist names from the universities. Soon thereafter, he and his uncle were arrested and beaten by the police, but they were not told why they were being beaten. Cela joined the Democratic Party in May 1991 and received his mechanical engineering degree in July 1991. In August 1991, a coalition government was established in Albania. The Democratic Party was in charge of the central government, but the Socialist Party was in charge of the local government in Gramsh. In 1992, Cela was elected chairman of the Democratic party for Gramsh and was involved in recruiting new members. From September 1991 until March 1994, he worked in a government factory in Gramsh as a mechanical engineer. He was fired in 1994 by the local government chairman but not told why. Cela believes it was because of his support of the Democratic Party.

By the end of 1994, the Democratic Party gained power over the Gramsh local government, and Cela was appointed director of road construction in early 1995, replacing a Socialist Party director. Cela promptly fired three Socialist Party members, one of whom "didn't respect [his] orders." He said they insulted him and wrote an article about him in the Socialist newspaper. In May 1995, Cela and a friend were at a restaurant when the brother of one of the fired employees approached Cela and invited him outside. Cela was held by two men while

2

being punched and kicked by the attacker who asked "Why did you fire my brother?" They started pushing him toward a small river. Cela's friend came outside, saw the situation, and called for help. The restaurant owner fired a gun in the air, and the attackers left. Cela testified that he did not see the gun, but it sounded like a pistol. He and his friend also left immediately. When leaving, Cela saw the restaurant owner but did not see any gun.

In July 1995, Cela fired 43 of 125 employees based upon orders he received when he first started his position. He claimed he fired people without regard to politics but admitted that 42 of the 43 he fired were Socialist Party members.

On June 29, 1997, the Democratic Party lost power, and Cela said his situation became difficult. In July 1997, he was in a truck with workers from both parties and was stopped by two people with automatic weapons. They shot close to Cela's feet and said it was his last warning to leave town. Cela testified that he did not leave because he was still the director of road construction, but he said the Socialist party was putting pressure on people to leave and give up their jobs. In February 1998, Cela was removed from his job because the political party in charge of the local government had changed again. Thereafter, he did not have job opportunities in Gramsh. Cela responded affirmatively when asked by the IJ, "Well, you got your job because of politics, and you lost it because of politics?" Cela also said he was confronted by Socialist supporters and received anonymous threats to the effect of: "Our day arrived, and now you are going to pay back all what you did to us, and this is your end." He said the majority of people he fired were in the Socialist Party and were angry about losing economic power.

When asked why these people were fired, Cela responded they were "unable to do their job," were faithful to the Socialist Party, opposed his appointment because he supported the Democratic party, and "disobeyed my orders." When asked for examples of orders disobeyed,

3

Cela said they were "incompetent" and did not respect the law and the orders. When asked for details, he said: "We wanted to buy some materials, they didn't respect the procedure that the law provided with regard to that." When asked to be more specific, Cela said "they didn't have the education and they unfitted the job."

A month after being removed from his job in Gramsh, Cela returned to Tirane, approximately 62 miles from Gramsh, and worked in a body shop from March to September 1998. He did not receive any threats or phone calls in Tirane and was not arrested or beaten. On September 20, 1998, Cela was in Gramsh after attending the funeral of Azem Hajdari, a Democratic Party leader who was assassinated. On his way home, a person he knew and two others confronted him regarding where he had been. They hit, kicked, and punched him unconscious and then hit him with hard tools. He awoke at his father's house in Gramsh and was in bed recovering for a week. On October 12, 1998, Cela left Albania from the Tirane airport without any problems. On March 24, 1999, Cela was issued an Albanian passport by the police in Gramsh.

Cela testified he could not stay in Tirane because he was a well-known person, and people from Gramsh knew where he was living. He said if he returned to Albania, he could be killed by Socialist supporters because of his activity with the Democratic Party. The State Department provided reports regarding country conditions in Albania, to which there was no objection.

The IJ filed his Oral Decision and Orders February 16, 2001, denying Cela's applications for asylum and withholding of removal and relief under the Convention Against Torture ("CAT"). The IJ carefully considered all of the testimony, the detailed application, and the supporting documents. While the IJ found that Cela was not credible on several major points, the denial of relief was also based on alternative grounds in which credibility was assumed. The IJ found:

4

The Court notes with respect to his being unable or unwilling to return to his home country, that respondent lived peacefully in Tirane, a mere 62 miles from Gramsh, where he had all of his recent difficulties. Even though the aggressors against him knew he was there living with his uncle and working in a body shop. The Court also notes in respondent's testimony, he indicated there were other cities, major cities, in Albania, who [sic] are two or three times as far from Tirane as where he was leaving [sic] peacefully, vis-a-vis his home city. Hence, even if you believe respondent's testimony, respondent by his own words, could live safely elsewhere in Albania, even though he asserted, without giving the Court any evidence, that he could not. Accordingly, even if you believe respondent's testimony, respondent's applications will be denied.

* * * *

Respondent was questioned at this juncture, why it was dangerous to return to Albania. He says, I can be killed by Socialist supporters. Then he was asked by counsel, why couldn't you live outside Gramsh. He said, well, I wouldn't be safe; everyone there knows me, or words to that effect. He then testified that even in Tirane, he didn't feel safe because the people in Gramsh, who had been threatening him, knew where he lived. Well, even if they knew where he lived, the Court notes that respondent later testified that he never had any difficulties in Tirane. They apparently never even contacted him in Tirane. They didn't beat him. They didn't threaten him or do anything else to him. This is a prime example of how he could leave [sic] in Tirane or elsewhere in Albania rather safely. Even despite the length of time that has now since elapsed, which probably would make it more safe given current country conditions.

The IJ then found that Cela had not suffered past persecution, even if all of his testimony was believed. Instead, the IJ found that Cela was the beneficiary and the victim of political patronage. "What happened to him is politically related, but it's got nothing to do with persecution. It's got something to do with just the way politics is; people getting fired from jobs because of whoever's in power." The Oral Decision continued:

Even assuming, however, that you find that respondent had been persecuted in the past, and even if you assumed that he might have been tortured in the past, respondent's own testimony and evidence indicates that he can live safely in Tirane, as he did in the past. The Court again notes that he lived there safely even though the people in Gramsh knew exactly where he was, and he certainly can live elsewhere in Albania, that is two or three times as far from Gramsh as Tirane. Accordingly, even if you believe his story, and even if you believe it's persecution, he's not met his burden, and accordingly, his applications would be denied on that bases [sic] as well.

The two major areas in which the IJ found Cela lacking in credibility were details of the restaurant incident and the orders that the fired employees refused to obey. The corroborating affidavit of Cela's friend at the restaurant, Zamir Balliu, said the owner "fired shots on the air from his hunting rifle." Cela testified at one point it was a pistol, then that he did not see it fired, then that he saw the owner after the attackers left, but did not see any gun. When asked about specific orders the employees disobeyed, Cela provided only vague answers.

On appeal to the BIA, Cela raised four issues: (1) the IJ erred by finding Cela had not suffered persecution; (2) the IJ erred by finding the events suffered were not politically motivated; (3) it is more likely than not that Cela will suffer persecution if deported to Albania; and (4) the IJ erred in his credibility findings by placing undue focus on minor points. On November 13, 2002, the BIA affirmed the decision below, without opinion. Although a copy of the BIA decision was mailed to Cela's counsel, Patrick Salley, it appears that a copy was not sent to Cela until October 20, 2004. At that time, Cela was told that Mr. Salley had been temporarily suspended from the practice of law and did not intend to return to practice in the immediate future.

On April 19, 2005, Cela filed his petition for habeas corpus pursuant to 28 U.S.C. § 2241 in the United States District Court, Eastern District of Michigan, and filed a supplemental habeas petition on April 26, 2005. The due process issues raised in the petition were: (1) ineffective assistance of counsel precluded him from filing a Petition for Review with the Sixth Circuit; (2) inadequate or faulty translation services denied his right to a full and fair hearing; and (3) the IJ violated due process by denying relief based on alleged contradictions between statements made at the hearing and statements in his application for asylum. The supplemental petition challenged the discretionary denial of Cela's request for suspension of deportation based upon extreme hardship to his wife and infant son. Cela was subsequently

6

deported. On May 24, 2005, Cela's Petition and Supplement were transferred to this Court pursuant to the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 231, 302.

## JURISDICTION

This Court has jurisdiction to review a final decision of the BIA. *Singh v. Ashcroft*, 398 F.3d 396, 400 (6th Cir. 2005); 8 U.S.C. § 1252. Additionally, in May 2005, while Cela's habeas petition was pending before the district court, Congress passed the REAL ID Act of 2005.

> The Act instructs the district courts to transfer any habeas petitions pending in the district court on the date of the enactment of the Act to the appropriate circuit court to be treated as a petition for review, without regard to whether the habeas petition had been filed within thirty days of the final order of removal, as required for petitions for review under 8 U.S.C. § 1252(b)(1).

*Tilley v. Chertoff*, 144 Fed. Appx. 536, 538 (6th Cir. 2006); *See also Ishak v. Gonzales*, 422 F.3d 22, 29 (1st Cir. 2005). Thus, despite the delay in seeking review of the IJ decision, the REAL ID Act grants jurisdiction to this Court and transfers Cela's habeas petition to be treated as a petition for review.

Despite this Court's general jurisdiction over Cela's habeas petition, it does not have jurisdiction to address any claims for which Cela failed to exhaust his administrative remedies. 8 U.S.C. § 1252(d)(1); *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004) ("Before a federal court may assert jurisdiction over an alien removal appeal, the alien must have exhausted all administrative remedies.") It also lacks jurisdiction over the discretionary decision to deny Cela's request for suspension of deportation based on extreme hardship. *Romero-Torres v. Ashcroft,* 327 F.3d 887, 889 (6th Cir. 2003).

## STANDARD OF REVIEW

When the BIA affirms an IJ's decision without opinion or adopts its reasoning, this Court reviews the IJ's decision directly. Singh, 398 F.3d at 401;Hasan v. Ashcroft, 397 F.3d 417, 419 (6th Cir. 2005). The Immigration and Naturalization Act provides that "administrative findings of

fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); Yu v. Ashcroft, 364 F.3d 700, 702-03 (6th Cir. 2004). Lack of credibility decisions, likewise, are reviewed under the substantial evidence standard. Id.

Thus, the Court "review[s] administrative findings of fact, such as whether an alien qualifies as a refugee, under the substantial evidence standard, keeping in mind that such findings are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Singh, 398 F.3d at 400 (quoting Yu, 364 F.3d at 702). The IJ's denial of withholding of removal is also reviewed under the substantial evidence standard. Yu, 364 F.3d at 703; Allabani v. Gonzales, 402 F.3d 668, 674 (6th Cir. 2005).

**ANALYSIS**

**I.      The Procedural Impact of the REAL ID Act of 2005**

The REAL ID Act of 2005 limited jurisdiction exclusively to the appropriate court of appeals for review of any order of removal.[1] 8 U.S.C. §1252(a)(5); see Bonhometre v. Gonzales, 414 F.3d 442, 446 (3d Cir. 2005) (holding the clear intent of Congress was to have all challenges to removal orders heard in a single forum and to convert habeas petitions into petitions for review); Feldman v. Gonzales, 2005 WL 3113488 at *2 (6th Cir. 2005). The scope of review is defined as "the administrative record on which the order of removal is based" and the standard of review is that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4). A final order of removal may be reviewed "only if – the alien has exhausted all administrative

---

[1] "Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter...." 8 U.S.C. §1252(a)(5).

remedies available to the alien as of right," unless the issues could not have been presented in the prior proceeding or it was "inadequate or ineffective to test the validity of the order." 8 U.S.C. §1252(d). The REAL ID Act was effective immediately and is to be applied "to cases in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after the date of the enactment of this division." REAL ID Act § 106(b) , Pub. L. No. 109-113, 119 Stat. at 311; Tilley, 114 Fed. Appx. at 538.

Transition procedures provided that, for all cases brought under 28 U.S.C. § 2241 and challenging a final administrative order of removal in district court, "the district court shall transfer the case ... to the court of appeals for the circuit in which a petition for review could have been properly filed." REAL ID Act §106(c). The court of appeals is required to treat the case as if it had been filed as a petition for review except that the thirty-day deadline shall not apply. Id.; Ishak v. Gonzales, 422 F.3d 22, 29 (1st Cir. 2005). Because Cela's petition was pending in district court at the time the REAL ID Act of 2005 was passed, he receives the benefit of review of his claims, despite his failure to meet the timely filing requirement for a petition for review.

In his Brief before this Court, Cela raises not only the due process issues presented in his habeas petition, but also a challenge to the BIA decision for affirming the IJ's adverse credibility ruling, a new challenge to the Country Reports produced at his hearing, and a challenge to the denial of his request for suspension of deportation.

## II.   Petitioner Failed To Exhaust Administrative Remedies For His Due Process Claims.

Exhaustion of administrative remedies is a threshold, statutory jurisdictional requirement for review of a final removal order. 8 U.S.C. § 1252(d)(1); Liti v. Gonzales, 411 F.3d 631, 641 (6th Cir. 2005) ("Because the Litis failed to raise this issue before the BIA below, we are without

9

jurisdiction to consider their petition for review on this ground.")  In Ramani, 378 F.3d at 559, this Court noted the importance of the exhaustion requirement to ensure that the INS has a full opportunity to consider claims, to avoid interference with the agency's process, and to allow compilation of a record adequate for judicial review.  Ramani also held that if unexhausted and exhausted claims are both presented, "only those claims that are properly exhausted may be considered."  Id. at 560.

A.     Cela Failed To Exhaust His Claim of Inadequate or Faulty Translation.

In his habeas petition, Cela complained he was denied due process because the translation at his removal hearing was so faulty as to deny him a fair opportunity to be heard. Cela raised four issues in his appeal to the BIA, but none of them mentioned any problem whatsoever with the translation at his removal hearing.  He was represented by counsel on appeal to the BIA and admits on page 26 of his Brief that counsel's representation was adequate until November 13, 2002, when the BIA's summary affirmation was issued.  If there had been any problems with the translation during the hearing, it would have been apparent at the hearing and subject to appeal to the BIA.  See Gishta v. Gonzales, 404 F.3d 972, 978-79 (6th Cir. 2005).  Since this issue was not raised before the BIA, this Court lacks jurisdiction to consider it.  Id.

B.     Cela Failed to Exhaust His Claim of Ineffective Assistance of Counsel.

Cela argues before this Court that his counsel was ineffective for failing to give him notice that the BIA had summarily affirmed the IJ's decision.  He claims prejudice because he could not timely file a petition for review with this Court.  Cela concedes that counsel was effective up to and including the day the BIA rendered their decision.

To raise a claim of ineffective assistance of counsel, an alien must comply with the procedures required by the BIA.  Matter of Lozada, 19 I & N. Dec. 637 (BIA 1988); Hamid v.

Ashcroft, 336 F.3d 465, 468-69 (6th Cir. 2003). "The proper avenue for raising ineffective assistance of counsel is by filing a motion to reopen proceedings with the BIA." Sswajje v. Ashcroft, 350 F.3d 528, 533 (6th Cir. 2003). For Cela to raise a claim of ineffective assistance of counsel, he must follow the proper procedure before the BIA. At this time, this Court does not have jurisdiction to consider the issue.

C.    Cela Failed to Exhaust His Claim That the IJ Clearly Erred By Basing a Credibility Decision Upon Variances Between Cela's Written Application and His Oral Testimony.

On appeal to the BIA, Cela challenged the IJ's decision of lack of credibility on the ground that his testimony was largely consistent and any inconsistencies arose from "undue focus on minor points." Before this Court, however, he makes the very different argument that the credibility decisions must be reversed because (1) the IJ impermissibly relied on a variance between his oral testimony and his written application, and (2) the decision is not supported by the record. Because these issues were not raised on appeal to the BIA, this Court lacks jurisdiction to consider them. Hasan, 397 F.3d at 419-20.

**III.    Even if Petitioner's Due Process Claims Had Been Exhausted, They Are Without Merit**

For Petitioner to succeed on his due process claims, he must show not only error, but also substantial prejudice. Gishta, 404 F.3d at 979. "A showing of prejudice is essentially a demonstration that the alleged violation affected the outcome of the proceedings; we will not simply presume prejudice." Id. (quoting Larita-Martinez v. INS, 220 F.3d 1092, 1095 (9th Cir. 2000)), Warner v. Ashcroft, 381 F.3d 534, 539 (6th Cir. 2004) ("Such proof of prejudice is necessary to establish a due process violation in an immigration hearing."). Moreover, the IJ's determination on eligibility for asylum must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Yu, 364 F.3d at 702 (quoting INS

11

v. Elias-Zacarias, 502 U.S. 478, 481 (1992)).  The findings of fact by the IJ "are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.' 8 U.S.C. § 1252(b)(4)(B)." Id.  In Ouda v. INS, 324 F.3d 445, 451 (6th Cir. 2003), this Court said the factual findings of the IJ, including adverse credibility determinations, are reviewed for substantial evidence and will be reversed only if the petitioner's evidence is "so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution."

An applicant for asylum must qualify as a "refugee" pursuant to 8 U.S.C. § 1101(a)(42)(A).  Yu, 364 F.3d at 702.  A "refugee" is defined as any person "who is unable or unwilling to return to" the person's country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42).  In order to establish that the applicant has a well-founded fear of future persecution, he must show:

> (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear.

Pilica v. Ashcroft, 388 F.3d 941, 950 (6th Cir. 2004).  Thus, a well-founded fear of future persecution has both an objective and subjective component: "an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable."  Id.

To obtain withholding of removal, an applicant must establish that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion."  Singh, 398 F.3d at 401 (internal quotations and citations omitted).  The applicant must show a clear probability of being subjected to persecution upon removal.  Id.  "Because an alien must meet a higher burden in

12

establishing a right to withholding of removal than in demonstrating asylum eligibility, an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal." Id.

A.    The Issues Cela Raised Before the BIA Are Without Merit.

The IJ's findings in this case are adequately supported by substantial evidence in the record, and Cela has not made any claim upon which a reasonable adjudicator would be compelled to conclude to the contrary. The credibility determination was not impermissibly based on improper factors, as Cela contended. More importantly, the IJ's decision was based on an alternative ground. The record shows that, even if credibility was determined in Cela's favor, his testimony did not show past persecution under the statute. Rather, Cela's testimony showed he was the beneficiary and victim of patronage politics. The evidence regarding the attacks Cela suffered demonstrated that they were related to hostility arising from his firings, rather than "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The record also contains substantial evidence to support the IJ's finding that Cela did not present evidence of an objectively reasonable fear of future persecution. Instead, Cela's testimony demonstrated that he could live safely in several cities in Albania. Accordingly, the issues Cela raised on appeal to the BIA are without merit and the BIA's decision is affirmed.

B.    The Transcript of Cela's Removal Hearing Does Not Show Faulty Translation Resulting in a Denial of Due Process.

Cela claims that the transcript of his removal hearing is replete with references to "indiscernible," which he claims indicate that the translator "had no idea of what was being said." He uses this foundation to build an argument that the IJ did not understand what Cela was saying and found Cela lacking in credibility as a result of poor translation. The BIA record reflects, however, many of the "indiscernible" references were for names of individuals, which

were clearly understood by the IJ. For example, the transcript at page 123 reads, in part, as

follows:

> In February of 1991, I together with 20 students, we initially started the hunger
> strike of students. One of those leaders (indiscernible) and (indiscernible), help in
> the organization for hunger strike, which was held in the student center.

In referring to this February 1991 incident, the IJ said:

> He also indicated that two of the other 20 students who start this were Azem
> Hajdari, who later became a member of Parliament and was assassinated
> presumably by the Socialist Party, and Arben Broci, a student leader who was
> later killed during the course of demonstration.

Whether the "indiscernible" reference in the transcript was because the translator missed the

name or the court reporter did not know how to spell it, there is no prejudice to Petitioner, since

the IJ understood him completely.

The transcript also shows that Cela understood most of the questions presented to him,

responded coherently, and the IJ and counsel understood the responses. Where there was

confusion, it was quickly clarified. See, e.g., JA 118-19, 128-29, 132. This situation is very

different from the facts in Ahmed v. Gonzales, 398 F.3d 722 (6th Cir. 2005), and Amadou v. INS,

226 F.3d 724 (6th Cir. 2000), on which Cela relies. In Ahmed, the IJ had significant difficulty in

understanding the testimony and "created much of the confusion" himself. 398 F.3d at 726. In

Amadou, the IJ was on notice during the hearing that there were interpretation problems

because of different dialects. The interpreter mentioned "having some problems" several times.

266 F.3d at 727. By contrast, in the present case, there is no hint of any problem and no claim

of any translation problem on appeal to the BIA. See Gishta, 404 F.3d at 978-79.

Additionally, Cela cannot show prejudice because the IJ's decision was based on an

alternative ground. The IJ assumed Cela was credible, but denied his request for asylum based

upon Cela's testimony that he had lived safely in Tirane with his uncle and was never contacted,

14

threatened, or beaten, despite the fact that those he claimed were persecuting him knew where he lived. Thus, even if Cela's testimony were presumed to show past persecution in Gramsh, he failed to show a well-founded fear of future persecution if he returned to Albania. Because the IJ denied asylum on an alternative ground that assumed credibility, Cela cannot show prejudice arising from any translation error that may have affected his credibility.

C. The IJ's Denial of Asylum Was Not Improperly Based Upon Inconsistencies Between Cela's Written Application and His Hearing Testimony.

Cela relies on this Court's unpublished opinion in Ileana v. INS, 106 Fed. Appx. 349 (6th Cir. 2004) to argue he was denied due process because the IJ improperly based an adverse credibility ruling upon a variance between his written application and his testimony at the removal hearing. Petitioner cannot establish error or prejudice on this ground for several reasons. First, asylum was denied without regard to Cela's credibility; thus, there can be no prejudice. Second, the inconsistency on which the IJ relied was between Cela's testimony and the corroborating affidavit of his friend regarding the incident at a restaurant, not Cela's application. Third, Cela provided the IJ a detailed, supplemental application prepared with the assistance of counsel, not some abbreviated application on which omissions might be expected. Thus, cases urging caution regarding omissions in short, initial applications for asylum, such as Petitioner's case of Aguilera-Cota v. INS, 914 F.2d 1375 (6th Cir. 1989), are readily distinguishable.

In Ileana, the IJ based an adverse credibility determination on an omission in an application prepared without the assistance of counsel. Under those circumstances, the court said:

> In sum, limited space provided by the initial application, along with the fact that Ileana prepared it on his own, makes the mere omission of some of these incidents not only insignificant, but expected.

15

Petitioner argues that the IJ made the same mistake in his case. Unlike Ileana, however, Cela prepared a detailed, supplemental application for the IJ with the assistance of counsel and included a three-page, single-spaced attachment. Moreover, the lack of credibility determination was not based upon some omission, but upon an inconsistency with corroborating evidence provided at the hearing.

Finally, this Court did not establish in Ileana a rule that adverse credibility determinations cannot be based upon discrepancies between a written application and oral testimony, as Petitioner claims. To the contrary, subsequent cases have affirmed adverse credibility decisions based on inconsistent statements made in the application and during the hearing. See, e.g., Singh, 398 F.3d at 402; Shkabari v. Gonzales, 427 F.3d 324, 329(6th Cir. 2005) ("omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim." (quoting Liti, 411 F.3d at 637).

**IV.     Petitioner's Additional Claims Are, Likewise, Without Merit.**

In his Brief before this Court, Petitioner raises three additional claims, each of which is devoid of merit.

First, Cela argues that the BIA abused its discretion by affirming the IJ's adverse credibility determination because such a determination was contrary to the law regarding discrepancies between applications and oral testimony. As discussed above, this issue is both unexhausted and without merit. Accordingly, Petitioner gains no ground on this claim.

Second, Cela argues that the Country Reports were insufficient to rebut his credible testimony regarding persecution (Petitioner's Brief 48). Because this issue was not presented to the BIA on appeal, this Court is without jurisdiction to review it. Liti, 411 F.3d at 641. Additionally, the IJ assumed Cela was credible when denying his application for asylum on alternative grounds. Thus, this argument is without merit.

Third, Cela concludes his Brief with a request for an "order that the BICE District Director abused his/her discretion by denying Cela's request for suspension of deportation based on humanitarian considerations regarding his wife's health and the stress his deportation would put on his family" (Petitioner's Brief pp. 52-53). There is nothing in the BIA record regarding this request. Moreover, a "suspension of deportation" has been replaced by a "cancellation of removal" and is a discretionary decision of the Attorney General that this Court lacks jurisdiction to review. In Romero-Torres, 327 F.3d at 889, this Court said:

> Cancellation of removal, like suspension of deportation before it, is based on statutory predicates that must first be met; however, the ultimate decision whether to grant relief, regardless of eligibility, rests with the Attorney General.

Since the decision is a discretionary one for the Attorney General, it is not subject to review by a court. 8 U.S.C. § 1229B; Id. at 891.

For all of the foregoing reasons, the decision of the BIA is affirmed.

17